IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JANE DOE,

    Plaintiff,

v.     Civil Case No. SAG-19-2670

CHESAPEAKE MEDICAL SOLUTIONS, LLC, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Plaintiff Jane Doe ("Plaintiff") filed this case against Chesapeake Medical Solutions, LLC ("the YDI LLC"), Chesapeake Medical Solutions, P.A. ("the YDI P.A.") (together "the YDI Defendants"), and Dr. Walter Gianelle (collectively, "Defendants"), alleging three counts: sexual harassment, medical malpractice, and negligent supervision and retention. ECF 1. On December 2, 2019, this Court issued a Memorandum Opinion, ECF 23 ("the Opinion") and Order, ECF 24, which granted in part and denied in part Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF 13. As relevant here, this Court dismissed, without prejudice, Counts II and III of Plaintiff's Complaint. ECF 23 at 12-15.[1] Plaintiff has now filed a Motion for Reconsideration of those two rulings, ECF 25, and a Memorandum in Support thereof, ECF 25-1 (collectively, "the Motion"). Defendants filed an Opposition, ECF 27, and Plaintiff replied, ECF 33. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Plaintiff's Motion will be denied.

---

[1] The Court's ruling is also available at *Doe v. Chesapeake Med. Sols., Inc.*, No. SAG-19-2670, 2019 WL 6497962 (D. Md. Dec. 2, 2019).

## I. FACTUAL BACKGROUND

### A. The Underlying Conduct

The facts, as alleged in Plaintiff's Complaint, are fully set forth in the Court's prior Opinion. ECF 23 at 1-3; *see* ECF 1 (Plaintiff's Complaint). As relevant here, Plaintiff alleges that the YDI LLC and the YDI P.A. do business as six urgent care medical facilities on the Eastern Shore known as "Your Doc's In" ("YDI"). ECF 1, ¶¶ 5-6. Defendant Dr. Gianelle is a physician and "the highest ranking person, principal, and alter-ego of the YDI organization." *Id.* ¶ 7. YDI hired Plaintiff to manage one of those urgent care facilities in 2011. *Id.* ¶ 12. Two years later, in 2013, Plaintiff was diagnosed with a "life-threatening" illness requiring extensive treatment, including an organ transplant. *Id.* ¶ 13. After her diagnosis, Plaintiff alleges that Dr. Gianelle became involved in her medical care as a "trusted medical advisor and friend." *Id.*

In or around October, 2015, while Plaintiff remained ill, Dr. Gianelle allegedly "proposed a secret affair with Plaintiff, promising to take care of Plaintiff and to protect her employment at YDI." *Id.* ¶ 15. Plaintiff claims that she subsequently became dependent on Dr. Gianelle for both her job and for "important aspects of her local medical care on the Eastern Shore." *Id.* ¶ 16. Accordingly, she allegedly "was not in a position to refuse sex" with Dr. Gianelle. *Id.*

During her illness, Plaintiff alleges that Dr. Gianelle performed health care procedures on her, and that Dr. Gianelle would sometimes demand sex "as a form of compensation" afterwards. *Id.* ¶ 17. Plaintiff describes two specific incidents in her Complaint. First, she alleges that on one occasion, "Plaintiff suffered a hernia, which Gianelle attempted to repair at YDI's Easton, Maryland clinic." *Id.* Despite the operation being unsuccessful, Dr. Gianelle allegedly "demanded that Plaintiff have sexual intercourse with him in the clinic." *Id.* Plaintiff claims that Dr. Gianelle made no medical record of this attempted hernia repair. *Id.* Second, Plaintiff

2

alleges that at some unspecified time after that visit, at the same Easton, Maryland clinic, Dr. Gianelle repaired a surgical incision of Plaintiff's that had opened since her surgery. *Id.* Plaintiff alleges that despite her surgeon's instructions to "not have sexual intercourse" and despite the fact that she was "in no physical condition" to have sex, Dr. Gianelle "demanded and received sex in the clinic, as a form of compensation for the procedure." *Id.*

B. <u>Plaintiff's Claims for Relief</u>

Two of Plaintiff's three claims for relief rely on these facts.[2] Specifically, Count II seeks damages from all Defendants for Medical Malpractice. *Id.* ¶¶ 33-38. Plaintiff asserts that Dr. Gianelle owed her a duty of care "to treat Plaintiff with respect and in a professional manner, and to refrain from engaging in conduct that would cause Plaintiff mental, physical, and emotional injury." *Id.* ¶ 34. Plaintiff also alleges that Dr. Gianelle owed her a duty "to exercise ordinary and accepted medical care and skill," which includes a duty to maintain "appropriate and accepted physician-patient boundaries between himself and Plaintiff, and to abide by recognized standards of medical ethics." *Id.* Dr. Gianelle allegedly breached these duties "by negligently engaging in inappropriate and unethical sexual contact with Plaintiff" that "served no medical or therapeutic purpose." *Id.* ¶ 35. Dr. Gianelle's conduct also allegedly "violated appropriate and accepted physician-patient boundaries." *Id.* Plaintiff alleges that she has suffered physical, emotional, and psychological harm as a result. *Id.* ¶ 37.

Count III, asserted only against the YDI Defendants, seeks damages from them under a Negligent Supervision and Retention theory of liability. *Id.* ¶¶ 39-47. Plaintiff claims that Dr.

---

[2] Plaintiff also alleges in Count I that sex with Dr. Gianelle was a *quid pro quo* requirement of her employment with YDI, ECF 1, ¶¶ 16, 18-19, 21-23, 28, and that Dr. Gianelle's repeated demands for sex created a hostile work environment, *id.* ¶¶ 23, 25, 28. The Court granted in part, and denied in part, Defendants' Motion to Dismiss Count I. ECF 23 at 8-12; ECF 24, ¶¶ 1-2. Plaintiff's instant Motion does not challenge any of these rulings. *See* ECF 25, ¶¶ 3-5.

3

Gianelle's conduct must be imputed to YDI, because "YDI had actual or constructive knowledge of Gianelle's conduct" because "Gianelle, as the highest-ranking person, principal and alter-ego of YDI, was aware of his own conduct." *Id.* ¶ 42. YDI allegedly permitted, "if not encouraged," Dr. Gianelle's conduct, and by not taking any preventive or remedial action to curb it, "YDI placed Plaintiff at risk of harm from Gianelle." *Id.* ¶¶ 43-44. Plaintiff again alleges that this caused her physical, emotional, and psychological harm. *Id.* ¶ 47.

    C.    <u>The Court's December 2, 2019 Memorandum Opinion</u>

On October 10, 2019, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on each count in the Complaint. ECF 13. After declining to consider Defendants' motion as one for summary judgment, this Court, as relevant here, granted the Defendants' Motion to Dismiss Counts II and III of the Complaint on December 2, 2019. ECF 23 at 7-8, 12-15. With regards to Count II, the Court first observed that no case other than *Clemente v. Roth*, Civil No. WGC-01-CV-865, 2005 WL 4099829 (D. Md. Mar. 30, 2005), *aff'd*, 177 F. App'x 999 (4th Cir. 2006) (per curiam), considered whether, under Maryland law, a physician commits medical malpractice when he engages in sexual conduct with a current patient. ECF 23 at 12-13. After discussing *Clemente* and a survey of cases decided post-*Clemente* in other jurisdictions, this Court concluded that, under Maryland law,

> sexual relationships between physicians and patients generally do not constitute medical malpractice, unless (1) the doctor is specifically providing psychiatric or mental health treatment to the patient or (2) the doctor portrays the sexual activity to be a part of the required medical treatment for the patient's condition, in order to induce the patient's consent.

*Id.* at 13 (citations omitted). Finding that the Plaintiff failed to allege facts to demonstrate that her claim fell under either exception, the Court dismissed Count II, but did so without prejudice,

4

noting that Plaintiff had at least alleged "that Dr. Gianelle provided other unspecified medical treatment to her on various occasions." *Id.* at 14.

As to Count III of the Complaint, the Court noted that since Plaintiff's medical malpractice claim was subject to dismissal, the only basis for her Negligent Retention and Supervision claim was her Title VII *quid pro quo* sexual harassment claim. *Id.* at 15. Because of the "well established" principle that Title VII claims cannot serve as the basis of a negligent retention and supervision claim, the Court held that Count III must be dismissed. *Id.* (quoting *Russell v. Russel Motor Cars, Inc.*, 28 F. Supp. 3d 414, 419-20 (D. Md. 2014)). The Court dismissed Count III without prejudice, however, allowing for the possibility that Plaintiff files an Amended Complaint alleging sufficient facts to state a viable medical malpractice claim under Maryland law, as defined in the Opinion. *See id.*; ECF 24, ¶ 4 (the implementing Order).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision" that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time" before entry of a final judgment. *See also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469-70 (4th Cir. 1991) (approving the trial court's reference to Rule 54(b) in reconsidering its ruling on the defendant's Rule 12(b)(6) motion to dismiss); *Lynn v. Monarch Recovery Mgmt, Inc.*, 953 F. Supp. 2d 612, 618 (D. Md. 2013) ("Motions for reconsideration of an interlocutory order are governed by Federal Rule of Civil Procedure 54(b) . . . ."). In this Court, motions for reconsideration must be filed within fourteen days after the Court enters the order. Loc. R. 105.10.

While the Fourth Circuit has not clarified the precise standard applicable to motions for reconsideration, *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 449 (D. Md. 2015), it has stated that motions for reconsideration "are not subject to the strict standards applicable to motions for reconsideration of a final judgment" under Rules 59(e) and 60(b), *Carrero v. Farrelly*, 310 F. Supp. 3d 581, 584 (D. Md. 2018) (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003)); *see Fayetteville Investors*, 936 F.2d at 1470 (expressing "vigorous[] disagree[ment]" with a trial court's use of a Rule 60(b) standard in reconsidering its previous order on a Rule 12(b)(6) motion). However, courts in this District frequently look to the standards used to adjudicate Rule 59(e) and 60(b) motions for guidance when considering Rule 54(b) motions for reconsideration. *Carrero*, 310 F. Supp. 3d at 584; *Butler*, 307 F.R.D. at 449; *Cohens v. Md. Dep't of Human Resources*, 933 F. Supp. 2d 735, 741 (D. Md. 2013); *see also Fayetteville Investors*, 936 F.2d at 1470 (positively discussing a district court's reference, but not strict adherence, to the Rule 60(b) standards in reconsidering its prior ruling (citing *Gridley v. Cleveland Pneumatic Co.*, 127 F.R.D. 102 (M.D. Pa. 1989))).

Motions to amend final judgments under Rule 59(e) may only be granted "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993). Further, Federal Rule of Civil Procedure 60(b) explicitly provides that a court may only afford a party relief from a final judgment if one of the following is present: "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud or misconduct by the opposing party; (4) voidness; (5) satisfaction; or (6) any other reason that justifies relief." As a general matter, however, this Court has stated that "'a motion to reconsider is not license to reargue the merits or present new

evidence' that was previously available to the movant." *Carrero*, 310 F. Supp. 3d at 584 (quoting *Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.*, 142 F. Supp. 2d 676, 677 n.1 (D. Md. 2001)). Ultimately, the decision to reconsider interlocutory orders rests in this Court's "broad discretion." *Am. Canoe Ass'n*, 326 F.3d at 515 (holding that a trial court's "otherwise broad discretion to reconsider interlocutory orders is narrowed in the context of motions to reconsider" issues of the trial court's subject matter jurisdiction).

## III. ANALYSIS

Plaintiff urges the Court to reconsider its dismissal of Counts II and III of the Complaint, arguing that it was predicated on a finding that, under Maryland law, a breach of medical ethical standards regarding sexual relationships with patients is not *ipso facto* medical malpractice. ECF 25-1 at 2 (citing ECF 23 at 14). In Plaintiff's Opposition to Defendants' Motion to Dismiss, Plaintiff recognized the lack of Maryland case law governing her medical malpractice claim (outside of this Court's ruling in *Clemente*, 2005 WL 4099829, at *12), but argued nonetheless that her claim was legally viable. *See* ECF 17 at 11-20. Neither party asked this Court to consider certifying any question of law to the Maryland Court of Appeals. *See id.* Now, because there is "no Maryland case law at all" on this issue, Plaintiff asks the Court to reconsider its ruling, stay dismissal (without prejudice) of Counts II and III, and instead certify four questions of law to the Maryland Court of Appeals:

    (a)    Under what circumstances does a sexual relationship between and a physician and a patient of the physician, in violation of the COMAR regulations and other medical ethical standards, give rise to a cause of action for medical malpractice under Maryland law?

    (b)    Do the allegations of the Complaint, if taken as true, state a cause of action for medical malpractice under Maryland law?

    (c)    In Maryland, is a physician-patient relationship a fiduciary relationship, or "fiduciary in nature"?

  (d)  Do the allegations of the Complaint, if taken as true, give rise to claim [sic] that the physician breached a fiduciary, of "fiduciary like," duty to the patient"?

ECF 25-1 at 5-6.

  Plaintiff contends that this Court's December 2, 2019 ruling "disregards the holdings in *McCracken v. Walls-Kaufman*, 717 A.2d 346 (D.C. 1998) and *Hoopes v. Hammargren*, 725 P.2d 238 (Nev. 1986)." ECF 25-1 at 4. According to Plaintiff, if this Court certified the questions of law presented by Counts II and III of her Complaint, the Court of Appeals may rule in accordance with those cases, and not align itself with the case that this Court relied on in its December 1 ruling, *Clemente v. Roth*. *See id.* at 4-5. Plaintiff further contends that not certifying any questions of law to the Court of Appeals "is a harsh result, depriving the Plaintiff (and also future plaintiffs) of a remedy if in fact a cause of action for malpractice is viable under Maryland law." *Id.* at 5.

  To be sure, the Court agrees with Plaintiff that Counts II and III present at least one question of law that would qualify for certification. The Maryland Uniform Certification of Questions of Law Act provides that the Maryland Court of Appeals may answer certified questions of law "if the answer may be determinative of an issue" in a case before the Court, and if there is no controlling Maryland appellate decision, constitutional provision, or statute. Md. Code Ann., Cts. & Jud. Proc. § 12-603 (West 2019). As this Court's previous ruling recognized, both implicitly and explicitly, whether Plaintiff can succeed on a medical malpractice claim based on a doctor's violation of ethical rules prohibiting sexual relationships with patients has been unanswered by Maryland's appellate courts, and would decide the viability of Counts II and III. ECF 23 at 12-15; *see also id.* at 13 ("[N]o Maryland case, other than *Clemente* in this Court, considered whether such an ethical violation also constitutes medical malpractice.").

8

Just because a question of law qualifies for certification, however, does not mean the Court *must* certify it. *See Lehman Bros. v. Schein*, 416 U.S. 386, 390-91 (1974) ("We do not suggest that where there is doubt as to local law and where the certification procedure is available, resort to it is obligatory."). While Plaintiff is correct that the Maryland Court of Appeals encourages certification, *see* ECF 25-1 at 3 (quoting *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 705 (2010)), the statute plainly does not require a court to certify unanswered questions of law under any circumstances, *see* Md. Code Ann., Cts. & Jud. Proc. § 12-603. Indeed, it is well settled that the decision to certify questions of law to state high courts rests in the trial court's discretion. *Lehman Bros.*, 416 U.S. at 391; *Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234 (4th Cir. 2014); *Nat'l Capital Naturists, Inc. v. Bd. of Supervisors of Accomack Cty.*, 878 F.2d 128, 132 (4th Cir. 1989).

Plaintiff has not demonstrated why this Court's prior ruling constitutes an abuse of discretion, let alone a clear error of law. First, Plaintiff never requested certification in opposing Defendants' Motion to Dismiss, and now her request stands in a different procedural posture. Indeed, Plaintiff's instant Motion does not neatly fall into most of the standards typically applied to Rule 59(e) or Rule 60(b) motions. Plaintiff does not point to any previously undiscovered evidence, any new ruling from a controlling jurisdiction, or any sort of fraud, mistake, or other misconduct by any party. *See* ECF 25, ¶¶ 3-5; ECF 25-1 at 2-6. Instead, Plaintiff appears to argue that this Court erred by failing to, *sua sponte*, certify questions of law to the Maryland Court of Appeals. *See* ECF 25-1 at 2-5. Plaintiff provides no argument as to whether this was a clear legal error, a decision that results in "manifest injustice," or is simply an abuse of the Court's discretion.

Inherently, it would seem that an argument that the Court should have certified questions of law to the Maryland Court of Appeals suggests clear error. In the Rule 59(e) context, for a previous judgment to be "clear error," the court's previous decision must be "dead wrong." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009). Indeed, the Fourth Circuit in *TFWS* used even stronger language in describing the standard for clear error: "The prior judgment cannot be 'just maybe or probably wrong; it must . . . strike the court as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Id.* (quoting *Bellsouth Telesensor v. Info. Sys. Networks Corp.*, Nos. 92-2355, 92-2437, 1995 WL 520978, at *5 n.6 (4th Cir. Sept. 5, 1995)). This Court's decision to ascertain the current state of Maryland law on its own, as is its duty, without any previous request for certification of the issue to the Maryland Court of Appeals, does not now strike the Court with such force. *See also Hatfield v. Palles*, 537 F.2d 1245, 1248 (4th Cir. 1976) ("There have been no decisions by the South Carolina Supreme Court on the issue . . . . A federal court *must* therefore, as above indicated, endeavor to decide the issue in the way it believes the South Carolina Supreme Court would decide it." (citations omitted) (emphasis added)).

Second, this Court appropriately reviewed Maryland precedent to ascertain the governing Maryland law. In opposing Defendants' Motion to Dismiss Counts II and III, Plaintiff argued at length that this Court's decision in *Clemente* was inapplicable, and that the decisions in *McCracken* and *Hoopes* were more persuasive. ECF 17 at 11-15. While the Court's Opinion did not explicitly express its rejection of the *McCracken* and *Hoopes* rationales, the Court considered those cases (and all others that the parties cited in their briefing), and ultimately found that the *Clemente* rationale, as well as that of the courts post-*Clemente* holding similarly, more persuasive. *See* ECF 23 at 12-14. Contrary to Plaintiff's assertions, *McCracken* and *Hoopes*

10

read as outliers, standing in stark contrast to what appears to be a consensus among other courts. Plaintiff's current Motion for Reconsideration does not, as the Court reads it, ask the Court to reconsider its view of *McCracken* and *Hoopes* as outliers, but instead asks the Court to merely reconsider its "decision" to not, *sua sponte*, certify those questions of law to the Maryland Court of Appeals. *See* ECF 25-1 at 4-5; ECF 33 at 3-6. Accordingly, the Court will not delve into the legal merits of its ruling.[3]

Plaintiff argues that because the Fourth Circuit and this Court have certified unanswered questions of law to the Court of Appeals in previous cases, this Court should now do so here. ECF 25-1 at 2-3; ECF 33 at 3-5. Plaintiff relies heavily upon the Fourth Circuit's decision in *Antonio*. In that case, this Court entered summary judgment in favor of the defendant, and the plaintiff filed a motion for reconsideration with the Court. *Antonio v. Sec. Servs. of Am., LLC*, Civil No. AW-05-2982, 2010 WL 2858252, at *7-9 (D. Md. July 19, 2010). Along with the motion for reconsideration, the plaintiff filed a motion to certify to the Maryland Court of Appeals an issue the Court previously decided in the motion for summary judgment. *Id.* at *9. The Court denied both motions. *Id.* at *7-9. With regards to the motion for certification, this Court found that certification would only "cause delay and possibly waste resources." *Id.* at *9. On appeal, the Fourth Circuit discussed at length the issues of Maryland law presented, and ultimately decided to certify a question of law to the Maryland Court of Appeals. 749 F.3d 227, 234-37 (4th Cir. 2014). The court, however, declined to decide whether this Court had abused its discretion in not certifying the question of law itself. *Id.* at 237 n.5.

---

[3] Even if Plaintiff had asked the Court to reconsider the merits, the Court would decline to do so, as relitigating the merits of a previous decision is an improper use of a motion for reconsideration. *Carrero*, 310 F. Supp. 3d at 584; *Chae Bros., LLC v. Mayor & City Council of Baltimore*, No. GLR-17-1657, 2019 WL 1040434, at *3 (D. Md. Mar. 5, 2019).

Neither *Antonio* nor the other cases Plaintiff cites convince the Court that certification is appropriate under the particular facts and circumstances of Plaintiff's case. The beneficial purposes of certification – saving judicial resources and promoting judicial federalism – would not be furthered in this case. First, as the Court described in its initial ruling, on appeal in *Clemente*, the Fourth Circuit considered the legal issue that Plaintiff now seeks certification of to the Maryland Court of Appeals. *Clemente*, 171 F. App'x at 1002; *see* ECF 23 at 13. The Fourth Circuit held:

> As is relevant here, the court concluded that Dr. Cardany's sexual relationship with Prentice would not constitute medical malpractice under Maryland law. The court found it persuasive that courts from other jurisdictions had held almost unanimously that, other than a mental health professional or a doctor who essentially takes on the role of a mental health professional, a doctor who does not induce his patient to have sexual relations with him as necessary for medical treatment does not commit medical malpractice simply by engaging in sexual relations with his patient. *See Gunter v. Huddle*, 724 So.2d 544, 546 (Ala. Civ. App. 1998); *Korper v. Weinstein*, 57 Mass. App. Ct. 433, 783 N.E.2d 877, 879-80 (2003); *Odegard v. Finne*, 500 N.W.2d 140, 143 (Minn. Ct. App. 1993); *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607, 614 (2000); *Darnaby v. Davis*, 57 P.3d 100, 104 (Okla. Civ. App. 2002). *But see Hoopes v. Hammargren*, 102 Nev. 425, 725 P.2d 238, 242-43 (1986) (holding that patient who engaged in consensual sexual relations with her doctor while they had an ongoing doctor-patient relationship may establish liability against doctor for breach of fiduciary duty if she shows that the doctor "held a superior authoritative position in the professional relationship," "that, as a result of [the patient's] illness, she was vulnerable," and that the doctor proximately caused her harm by "exploit[ing] the vulnerability"). . . .
>
> Clemente challenges the orders granting summary judgment against him on . . . the claim based on the sexual relationship. . . . Having reviewed the record, the parties' briefs, and the applicable law, and having had the benefit of oral argument, we find no error and affirm on the reasoning of the district court.

*Clemente*, 171 F. App'x at 1002. Of course, *Clemente*, as an unpublished opinion, is non-binding on this Court, but the Fourth Circuit's decision to not certify the issue of law present there is illuminating. The Fourth Circuit has demonstrated its willingness to certify issues of law on appeal, but did not do so in *Clemente*. *E.g.*, *Antonio*, 749 F.3d at 237-38; *Goldstein v.*

12

*Potomac Elec. Power Co.*, 578 F.2d 975, 978 (4th Cir. 1978). That the Fourth Circuit did not *sua sponte* certify the novel issue of law on appeal, and instead affirmed the trial court's ruling in an unpublished, per curiam opinion, shows the discretion federal courts have to decide such issues of law, especially where courts in other jurisdictions have already ruled on the precise issue presented. *See also Nat'l Bank of Wash. v. Pearson*, 863 F.2d 322, 326-27 (4th Cir. 1988) (upholding a federal district court's interpretation of a novel state law question; the court concurred with a state trial court judge's previous interpretation prior to removal, and that view was supported by a number of other jurisdictions).

Third, Plaintiff's decision to file her action in federal court cuts against her instant, and belated, pursuit of certification. In *Cantwell v. University of Massachusetts*, a party sought certification of a question of law to the Massachusetts Supreme Court, so that it could decide for the first time whether sovereign immunity would be abrogated under the facts of his personal injury action. 551 F.2d 879, 880 (1st Cir. 1977). The First Circuit noted:

> [T]he bar should take notice that one who chooses the federal courts in diversity actions is in a peculiarly poor position to seek certification. We do not look favorably, either on trying to take two bites at the cherry by applying to the state court after failing to persuade the federal court, or on duplicating judicial effort."

*Id.*

While the Fourth Circuit appears to view certification in a more favorable light today, this Court cannot ignore the applicability of the First Circuit's observation regarding litigants who attempt to "take two bites at the cherry." *Id.*; *see also Pearson*, 863 F.2d at 326-27. The *Clemente* decision was available to Plaintiff before she initiated her suit, and she could have chosen to bring her medical malpractice theory of liability in Maryland state court. The Court, of course, respects Plaintiff's right to select her forum, and avail herself of diversity jurisdiction in federal court. However, the Court is not willing to permit a party to seek relief in federal court

13

and only then, if unsuccessful, pursue re-adjudication in the state courts, hoping for a more favorable outcome.

Finally, the specific facts of Plaintiff's case demonstrate that certification would not further judicial economy. At the pleading stage, the Court construes the Plaintiff's Complaint in the light most favorable to her, and draws all reasonable inferences in her favor. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). However, in litigating Defendants' Motion to Dismiss, both Plaintiff and the Defendants provided the Court with various exhibits that they believed to support their positions. Included in both parties' exhibits were voluminous text message exchanges between Plaintiff and Dr. Gianelle from throughout their relationship. *See, e.g.*, ECF 13-2; ECF 17-4. The Court ultimately refused to consider these outside materials in ruling on Defendants' Rule 12(b)(6) contentions. ECF 23 at 7-8 (refusing to convert Defendants' Motion to Dismiss into one for Summary Judgment). The only time the Court referenced materials outside of the Complaint was to highlight the notion that on a motion to dismiss, the Court could not allow those materials to cloud its view of the legal sufficiency of Plaintiff's pleadings:

> The Court is well aware that the evidence attached by Defendants, and the evidence attached by both parties, can be interpreted to suggest that the chances of Plaintiff's recovery on a theory of *quid pro quo* harassment might be slight. *See, e.g.*, ECF 13-2; ECF 17-4. The text exchanges appear to depict a fully consensual sexual relationship, and indicate that, at times, Plaintiff initiated, and indeed encouraged, sexual contact, even during times of medical treatment for her various conditions. . . . Even where Plaintiff might have an uphill battle surviving a summary judgment motion after discovery, the complaint is not subject to dismissal if it meets the minimal [pleading] standards elucidated [in *Twombly*]."

*Id.* at 8-9 (internal citations omitted).

In considering the purposes of certification – saving judicial time and resources, and promoting judicial federalism – the Court simply cannot, however, overlook the tension between

14

Plaintiff's allegations and the evidence that she, herself, placed before the Court in opposing Defendants' Motion to Dismiss. The text messages evidence a highly unique situation, unlike a traditional physician-patient relationship.

It appears from the evidence that the sexual relationship between Plaintiff and Dr. Gianelle began sometime in October, 2015. ECF 1, ¶ 15; *see also* ECF 13-2 at 39 (August 21, 2016 text message from Plaintiff to Dr. Gianelle stating, *inter alia*, "Just realized Tuesday will be 10 months of pure perfection, we have gotten very good about hiding our love affair . . . . Love you baby!"). Several times after October, 2015, the evidence indicates that Dr. Gianelle served as an informal medical advisor to Plaintiff. For example, on November 20, 2015, Plaintiff complained to Dr. Gianelle of a hernia causing her pain. ECF 17-4 at 4. Dr. Gianelle accessed Plaintiff's scans that were apparently ordered by a different physician, and interpreted them, noting, "Think they going to want to fix that since it has a potential to be a problem." *Id.* at 5. Plaintiff responded that she was still waiting for her surgeon to check her belly. *Id.* One hour later, Plaintiff followed up that she would be having surgery at "University of Maryland," and that the "[s]ame doctor that did my arm is doing the surgery." *Id.* Just two days later, Plaintiff sent Dr. Gianelle the following: "Good morning! Woke up loving you…can feel you loving me. . . . Have an idea about Tuesday, you could pick me up at my home and we could go to Cambridge together! After you can drop me off on your way to Seaford. Will work perfectly!! Love you so much!!!!!" *Id.* at 6.[4] However, there is no evidence showing that Dr. Gianelle gave

---

[4] This is not the only instance in which Plaintiff initiated a meeting between herself and Dr. Gianelle after discussing her medical issues. *See, e.g., id.* at 12 (January 4, 2016 text message from Plaintiff describing recent blood test results, and then stating, "Doctor said I needed you to make love to me, think it will be in discharge paperwork! So, was thinking……Maybe you could drive me home via motel in Cambridge on Thursday?????? Think about it baby. My treat [heart emoji]").

15

similar advice prior to October, 2015, outside of Plaintiff's allegation that upon her diagnosis in 2013, Dr. Gianelle "became a trusted medical advisor and friend." ECF 1, ¶ 13.

Similarly, there is evidence that Dr. Gianelle provided Plaintiff with medical treatments, but there is nothing showing that these treatments occurred prior to October, 2015. *See, e.g.*, ECF 1, ¶ 17 (describing the attempted hernia surgery and suture repair, but failing to specify when those alleged procedures occurred); ECF 17-4 at 14 (January 11, 2016 text exchange between Dr. Gianelle and Plaintiff, in which Dr. Gianelle indicates that he will perform x-rays and potentially an MRI on Plaintiff's thigh and hip due to her pain while walking, and following up later in the afternoon with MRI scan report result summary); *id.* at 29 (October 10, 2016 text exchange in which Dr. Gianelle notes that he sent to the lab a sample of a mole that had "3 hairs growing out of it" taken from Plaintiff). Taken together, these unusual facts suggest that the Maryland Court of Appeals's judicial resources would be better utilized by analyzing the legal issues Plaintiff raises in the context of a more traditional physician-patient relationship.

Plaintiff's claim that failing to certify her proposed questions of law would prevent future litigants from asserting medical malpractice claims under her desired theory of medical malpractice liability simply misses the mark. The reality is that this Court's determination is not binding precedent on any other Court. Should this Court, or any Maryland state court, be faced with a future litigant's claim that her doctor committed medical malpractice by grooming her throughout the doctor-patient relationship to commence a sexual relationship, that future court can render whatever decision it believes to be correct. *Cf.* Fed. R. Civ. P. 11(b)(1) (allowing attorneys to bring legal claims that are supported "by a nonfrivolous argument for . . . reversing existing law or for establishing new law").

Although this Court will not exercise its discretion to certify a question of law to the Maryland Court of Appeals in this case, it is worth noting that Counts II and III have been dismissed without prejudice. Plaintiff may seek leave to amend her Complaint to provide more factual allegations to align Counts II and III with the legal framework elucidated in this Court's prior Opinion. *See* ECF 23 at 12-15.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Reconsideration, ECF 25, is DENIED. A separate Order follows.

Dated: February 26, 2020

/s/
Stephanie A. Gallagher
United States District Judge